**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LEFT FIELD MEDIA, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 15 CV 3115** |
| | ) | |
| **v.** | ) | **Judge Jorge L. Alonso** |
| | ) | |
| **CITY OF CHICAGO and ELIAS** | ) | **Magistrate Judge Michael T. Mason** |
| **VOULGARIS, Chicago Police** | ) | |
| **Commander,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**To: The Honorable Jorge L. Alonso**
**United States District Judge**

## REPORT AND RECOMMENDATION

Michael T. Mason, United States Magistrate Judge:

Currently pending before the Court is plaintiff Left Field Media's motion for preliminary injunction [33]. Left Field publishes a magazine called *Chicago Baseball*, which vendors offer for sale at home Cubs games primarily on the streets immediately adjacent to Wrigley Field. Plaintiff seeks to enjoin the City of Chicago from enforcing two of its peddling ordinances. For the reasons explained below, the Court respectfully recommends that the District Court deny plaintiff's motion for preliminary injunction.

**I.     Background**

**A.     Procedural History**

On April 8, 2015, Left Field initiated this action against the City and former Commander of the 19th District, Elias Voulgaris ("Commander Voulgaris"), seeking declaratory and injunctive relief. In its complaint, plaintiff brings First Amendment Challenges to three sections of the Chicago Municipal Code: Section 4-244-030, which

prohibits all peddling on the public ways without a peddler's license (Count I); Section 4-244-140, which prohibits all peddling on the public ways immediately adjacent to Wrigley Field (Count II); and Section 10-8-520, which exempts newspapers from the general prohibitions on peddling (Count III). In Count IV, plaintiff asserts his claims against Commander Voulgaris in his individual capacity.

After initiating this action, plaintiff quickly filed its motion for a temporary restraining order [5]. On April 10, 2015, the District Court granted plaintiff's motion and entered an order barring the City and Commander Voulgaris from interfering with plaintiff's access to the public sidewalks adjacent to Wrigley for purposes of selling *Chicago Baseball* [9]. The TRO has been extended on a few occasions so that these preliminary injunction proceedings could be resolved.[1] The preliminary injunction hearing was held before this Court on June 16, July 10, and July 21, 2015.[2]

### B.    Relevant Municipal Code Sections

In these preliminary injunction proceedings, plaintiff seeks to enjoin the defendants from enforcing the peddler's license requirement set forth in Section 4-244-030 and the no peddling zone surrounding Wrigley under Section 4-244-140.

Section 4-244-030 provides in relevant part: "It shall be unlawful for any person to engage in the business of a peddler without first having obtained a street peddler license under this chapter." A "peddler" is defined as "any individual who, going from

---

[1] The parties also agreed to delay the briefing on defendants' pending motion to dismiss Counts I, III, and IV [24].

[2] The parties initially indicated that the preliminary injunction hearing would only take one day. Clearly, that was not the case. Additionally, the vacation schedules of attorneys for both parties (which the Court was happy to accommodate) did contribute to some scheduling delays from the outset. The Court's unavoidable responsibilities during two weeks of criminal duty also led to further delay in scheduling.

place to place, whether on private property or on the public way, sells, offers for sale, sells and delivers, barters or exchanges any goods, wares, merchandise, wood, fruits, vegetables or produce from a vehicle or otherwise." Municipal Code of Chicago § 4-244-010.

Section 4-244-140 governs peddling in the vicinity of Wrigley Field and provides:

> No person shall peddle any merchandise on the sidewalk immediately adjacent to Wrigley Field; such sidewalk consisting of the north side of Addison Street, the east side of Clark Street, the south side of Waveland Avenue, and the west side of Sheffield Avenue. For purposes of this subsection (b), the term "sidewalk" shall mean that portion of the public way extending from the perimeter of the Wrigley Field stadium structure to the street curb or curb line.

Section 10-8-520 exempts newspapers from the peddling restrictions, stating "[n]o person, other than a licensed peddler ... shall sell, offer or expose for sale, or solicit any person to purchase any article or service whatsoever, except newspapers, on any public way."[3]

## C.    Factual History

Left Field Media is owned by Matthew Smerge.  (Pl.'s Mot. at Ex. 1, Smerge Decl. ¶ 2; 6/16/15 Hr'g Tr. 19.)[4]  Smerge currently serves as the publisher and editor of *Chicago Baseball*, which is released four times a year during the major league baseball season.  (Smerge Decl. ¶ 2; 6/16/15 Hr'g Tr. 19-20.)  For 19 years, *Chicago Baseball* has served as an alternative to the official Chicago Cubs program, offering news,

---

[3]  Plaintiff does not seek to enjoin the enforcement of the newspaper exemption at this time.

[4]  Included here for the sake of any reviewing court are citations to the unofficial rough transcripts provided by the court reporters.  Due to time constraints, the Court has been unable to obtain the official transcripts.  When those transcripts are available, the Court will issue a final Report and Recommendation, amending only the transcript citations.

analysis, and criticism about the team.  (Smerge Decl. ¶ 3; 6/16/15 Hr'g Tr. at 21-22.)

The magazine is sold exclusively before Cubs home games.  (Smerge Decl. ¶ 4; 6/16/15 Hr'g Tr. at 22.)  Smerge, along with anywhere from two to eight other vendors (depending on the game), sell the magazine for $2.00 a piece on the public sidewalks immediately adjacent to Wrigley Field.[5]  (6/16/15 Hr'g Tr. at 23-27.)  Smerge, who sells the magazine during most night and weekend games, typically stands on the public sidewalk on the northeast corner of Clark and Addison.  (Smerge Decl. ¶ 5; 6/16/15 Hr'g Tr. at 28.)  Another vendor mans the northwest corner of Addison and Sheffield. (Smerge Decl. ¶ 6; 6/16/15 Hr'g Tr. at 90.)  At times, two other vendors provide back up at those two busy corners of Clark and Addison and Addison and Sheffield.  (6/16/15 Hr'g Tr. at 29, 129-130.)  When available, other vendors are scattered to other corners surrounding Wrigley, and occasionally, to corners across the street.  (*Id.* at 88-89, 99-101.)  The vendors typically take their positions 15-30 minutes before the Wrigley gates open and sell through the end of the first inning.[6]  (*Id.* at 22.)

Each vendor dons a yellow shirt displaying the *Chicago Baseball* logo on the front and back, and carries anywhere from 50-150 magazines in an over-the-shoulder satchel.  (6/16/15 Hr'g Tr. at 27, 30-31; Pl.'s Hr'g Exs. 18(a) & (b).)  The vendors are entirely mobile and do not place anything on the ground while they sell the magazines. (6/16/15 Hr'g Tr. at 31-32.)  Smerge testified that he always stands on the public sidewalk within about five feet of the curb and tries to train his vendors to sell in the

---

[5] From 1996 through the 2014 season, the magazine was sold for $1.00.  (6/16/15 Hr'g Tr. at 23-24.)

[6] Gates open two hours prior to each game.  (6/16/15 Hr'g Tr. at 22.)

4

same manner as he does.  (*Id.* at 32-33.)  Vendors work purely on a commission basis and retain 50% of their sales.  (*Id.* at 33-34.)  Neither Smerge nor any other *Chicago Baseball* vendor has ever applied for a peddler's license.  (*Id.* at 34.)  According to Smerge, he did not believe that he was required to obtain a peddler's license due to the exemption for newspapers in the Municipal Code.[7]  (*Id.* at 34, 85-86.)

In 1996, the first year that the magazine was published, all of the *Chicago Baseball* vendors were apparently arrested and charged with peddling without a license. (Smerge Decl. ¶ 8.)  Ultimately, the City dismissed the charges.  (*Id.*)  According to Smerge, following that incident, *Chicago Baseball* vendors sold the magazine during every home game without any run-ins with the Chicago Police until 2013.  (Smerge Decl. ¶ 9.)

On opening day of the 2013 season, shortly after the gates opened, Commander Voulgaris approached Smerge while he was selling magazines on the corner of Clark and Addison.  (6/16/15 Hr'g Tr. at 35.)  Voulgaris advised Smerge that he was in a no peddling zone and must move across the street to sell the magazine.  (*Id.*)  Smerge responded that he had a First Amendment right to be there, but Voulgaris persisted, telling Smerge he would be arrested or ticketed if he did not move across the street. (*Id.* at 35-36.)  To avoid arrest or citation, Smerge moved across the street to the southeast corner of Clark and Addison.  (*Id.* at 36.)  That day he sold under 100

---

[7] Admittedly, Smerge has not looked at the Municipal Code recently and has only "glanced [at it] over the years."  (6/16/15 Hr'g Tr. at 86.)

magazines, a "very low total for an opening day."[8]  (*Id.* at 36-37.)

Smerge informed Jay Roper, the publisher of the magazine at the time, about his run-in with Voulgaris.  (6/16/15 Hr'g Tr. at 37.)  The next day Smerge and Roper composed a letter to Commander Voulgaris expressing their belief that the *Chicago Baseball* vendors had a First Amendment right to sell the magazines on the sidewalks directly outside of Wrigley Field.  (*Id.;* Pl.'s Hr'g Ex. 1.)  Smerge hand delivered the letter to the 19th District, but never received a response.  (6/16/15 Hr'g Tr. at 38-39.)  For the remainder of the 2013 season, the *Chicago Baseball* vendors resumed selling magazines on the sidewalks adjacent to Wrigley without incident.  (*Id.* at 39-40.)

On opening day in 2014, Voulgaris again approached Smerge while he was selling the magazine on the sidewalk on the northeast corner of Clark and Addison and told him he needed to move across the street and out of the no peddling zone.  (6/16/15 Hr'g Tr. at 41.)  In response, Smerge asked Voulgaris if the vendors could sell the magazines just off the curb in the street, which Smerge viewed as a better option than moving across the street.  (*Id.* at 41-42.)  Voulgaris approved.  (*Id.*)  So on that day, and for approximately the next three months, the vendors sold the magazine in the street, just off the curb of the sidewalks adjacent to Wrigley.  (*Id.* at 42.)  Smerge testified that the street position might have hurt sales "a little bit."  (*Id.*)

At some point in June of 2014, Voulgaris informed one of the *Chicago Baseball* vendors that he may require all of the magazine vendors to move across the street.

---

[8]  Other than tracking Left Field's total revenue, Smerge does not maintain records of the number of magazines each vendor sells during each game.  (6/16/15 Hr'g Tr. at 97-98, 101.)  He estimated that Left Field has sold anywhere from 30,000 to 50,000 magazines per season over the past several seasons.  (*Id.* at 78.)

(6/16/15 Hr'g Tr. at 42.)  Upon learning this, Smerge sent an e-mail to Voulgaris explaining his belief that the *Chicago Baseball* vendors had a First Amendment right to sell the magazine on the sidewalks surrounding Wrigley Field.  (*Id.* at 43, Pl.'s Hr'g Ex. 2.)  Smerge did not receive a response, but the next day Voulgaris approached one of the vendors and told him that he could resume selling magazines on the sidewalks adjacent to Wrigley.  (6/16/15 Hr'g Tr. at 43-44.)  All of the vendors did so for the remainder of the 2014 season without incident.  (*Id.* at 44.)

On opening day in 2015, Voulgaris stopped Smerge while he was approaching his typical position at the northeast corner of Clark and Addison.  (6/16/15 Hr'g Tr. at 44-45.)  Voulgaris told Smerge that all of the *Chicago Baseball* vendors needed to move across the street and that he would be ticketing any vendor he saw on the Cubs side of the street.  (*Id.* at 45.)  Despite this warning, Smerge began to sell magazines from his usual spot.  (*Id.*)  About a half hour later, Voulgaris issued Smerge a ticket for selling *Chicago Baseball* in a no peddling zone in violation of Section 4-244-140.  (*Id.* at 46; Pl.'s Hr'g Ex. 3.)  Voulgaris also warned Smerge that if he didn't move across the street he would be arrested.  (6/16/15 Hr'g Tr. at 47.)  Smerge moved across the street to the southeast corner of Clark and Addison, where he claims his sales were "reduced significantly."  (*Id.*)  Specifically, Smerge testified that before he moved, he sold 75 magazines in approximately a half hour.  (*Id.*)  After moving across the street, he sold about the same amount in two hours.  (*Id.*)  This action was filed three days after Voulgaris issued Smerge the citation.

At the hearing before this Court on 6/16/15, Commander Voulgaris provided testimony regarding his interactions with Smerge and other *Chicago Baseball* vendors.

Unfortunately, Commander Voulgaris suffered a medical emergency and was unable to resume his testimony at the continued hearing dates. Because the City was unable to cross-examine Voulgaris, his testimony was stricken and the City was given leave to call Sergeant Evangelos Hitiris, also of the 19th District, over plaintiff's objection.

Sergeant Hitiris is in charge of the unit of six officers that are responsible for patrolling the area surrounding Wrigley Field on game days. (7/21/15 Hr'g Tr. at 4-5.) After each game, Sergeant Hitiris and his unit tally how many tickets were issued in the area. (*Id.* at 9-10.) He explained that in 2014, approximately 968 tickets were issued. (*Id.* at 10.) Those tickets were for various offenses, including drinking on the public way, fights, ticket scalping, and peddling in a no peddling zone and/or without a license. (*Id.*) Sergeant Hitiris identified a number of tickets that were issued by his unit in 2014 to individuals peddling various items, including *Streetwise* magazines and t-shirts near Wrigley. (*Id.* at 20-23; Defs.' Hr'g Ex. 11.) He explained that he and his officers do not immediately give individuals tickets for violating an ordinance, but try to "start off the beginning of the year with giving everybody a warning." (7/21/15 Hr'g Tr. at 23.)

As for *Chicago Baseball* vendors, Hitiris testified that in 2013, there was some uncertainty in the 19th District as to whether they fell under the no peddling zone ordinance. (7/21/15 Hr'g Tr. at 25.) Voulgaris told Hitiris that he was "seeking clarification" on the issue. (*Id.*) As a result, Hitiris and his officers did not enforce the ordinance against the *Chicago Baseball* vendors in 2013. (*Id.*)

Like Smerge, Sergeant Hitiris testified that at some point during the 2014 season, the officers and the *Chicago Baseball* vendors reached a compromise whereby the vendors could stand in the street to sell the magazine. (*Id.* at 25-26.) During the

current season, after the TRO was entered, Sergeant Hitiris has asked some *Chicago Baseball* vendors to "move to the side" so that they were not obstructing the sidewalk. (*Id.* at 49-50.)

## II. Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). A plaintiff seeking a preliminary injunction must show he has a likelihood of success on the merits, and that he has no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied. *Stuller v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012). If the moving party meets these threshold requirements, the court "must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* The court also must consider the public interest in granting or denying an injunction. *Id.*

## III. Analysis

### A. Likelihood of Success on the Merits

The first element of a preliminary injunction requires that the plaintiff show a likelihood of success on the merits. In First Amendment cases, the likelihood of success on the merits will often be the determinative factor because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and because "injunctions protecting First Amendment freedoms are always in the public interest." *ACLU v. Alvarez*, 679 F.3d 583, 589-590 (7th Cir. 2012)

(quotations omitted).

## 1.    No Peddling Zone Requirement

Plaintiff challenges the constitutionality of the no peddling zone ordinance as it relates to "speech peddling" on the streets immediately adjacent to Wrigley Field on First Amendment grounds.  The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech, or of the press."  U.S. Const. Amend. I.  The First Amendment affords protection from state action by way of the Fourteenth Amendment.  U.S. Const. Amend. IV.

The parties and the Court agree that plaintiff's sale of *Chicago Baseball* falls within the scope of the First Amendment.  The fact that the magazine is offered for sale instead of given away does not lessen plaintiff's right to constitutional protection.  "It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak."  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).  Further, although some may not view the content of *Chicago Baseball* as pertinent as do the bleacher bums at Wrigley Field, the Seventh Circuit recently rejected the idea that sports reporting deserves lesser protection under the First Amendment.  *Wis. Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614, 625 (7th Cir. 2011) ("There is no basis for a rule that makes the press's right to coverage depend on the purported value of the object of their coverage.").  And of course, at issue here are the public sidewalks, long thought to be a "hallmark[] of a traditional public forum."  *Weinberg v. City of Chicago*, 310 F.3d 1029, 1035 (7th Cir. 2002) (quoting *Frisby v. Schultz*, 487 U.S. 474, 480, 108 S. Ct. 2495, 101 L.Ed.2d 1423 (1988)).  *See also*

*McCullen v. Coakley*, --- U.S. ----, 134 S. Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (noting that sidewalks "occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate.") (quotation omitted).

Even in such a public forum as the sidewalks surrounding Wrigley Field, "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.' " *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). The parties agree that this is the appropriate framework to assess the City ordinances at issue here.[9]

To begin, we must determine whether the no peddling zone ordinance is content-neutral. "Government regulation of expressive activity is content-neutral so long as it is justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791, 109 S.Ct. 2746 (quotations omitted). Here, plaintiff argues that the no peddling zone ordinance is content-based because newspapers are exempted from the City's peddling regulations. As did the Seventh Circuit in *Weinberg v. City of Chicago*, 310 F.3d 1029, we would recommend that the District Court reject plaintiff's argument on this point.

---

[9] We note that the City hasn't argued that *Chicago Baseball* magazine amounts to commercial speech and is subject to a different standard.

In *Weinberg,* the Court addressed whether the City's 1,000 foot ban on peddling surrounding the United Center violated the First Amendment.[10]  As discussed in more detail below, the Court ultimately answered that question in the affirmative.  However, the Court expressly rejected the notion that the newspaper exemption rendered the United Center peddling ban content-based.  In doing so, the Court noted that such differential treatment "is unconstitutional only if it 'is directed at, or presents the danger of suppressing, particular ideas.' "  *Weinberg*, 310 F.3d at 1035 (quoting *Leathers v. Medlock*, 499 U.S. 439, 453, 111 S.Ct 1438, 113 L.Ed.2d 494 (1991)).  Although *Weinberg* involved the sale of a book, a transaction the Court deemed likely to be more disruptive than the sale of a fifty cent newspaper, the Court's rationale can still be applied here.  While the sale of a magazine is arguably more akin to the sale of a newspaper, it simply does not appear that the City's exemption for newspapers, but not magazines, was an attempt "to suppress a certain message or viewpoint."  *Weinberg*, 310 F.3d at 1036.

Notwithstanding the newspaper exemption issue, the no peddling zone ordinance should be otherwise deemed content-neutral despite some recent uncertainty on the topic.  *See Norton v. City of Springfield,* 768 F.3d 713, 717 (7th Cir. 2014) ("We do not profess certainty about our conclusion that the ordinance is content-neutral.").  "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."  *Ward*,

---

[10] Interestingly, the plaintiff in *Weinberg* serves as one of Left Field's attorneys in this matter.

491 U.S. at 781, 109 S.Ct. 2746.  As recently explained by the Seventh Circuit, the Supreme Court has classified two types of regulations as content-based: (1) those that restrict speech because of the idea it conveys, and (2) those that restrict speech because the government disapproves of its message.  *Norton*, 768 F.3d at 717.  The no peddling zone simply does not fit into either category.

According to the Alderman of the 44th Ward, Tom Tunney, and as discussed in more detail below, the City adopted the no peddling ordinance to alleviate congestion and ensure public safety on the sidewalks and streets surrounding the stadium after receiving complaints from local residents and business owners.  The ordinance is silent as to content and serves as a general ban on the sale of all merchandise (again, except newspapers), regardless of the message being conveyed.  In other words, the ordinance regulates where vendors peddle, not what they peddle.  *See McCullen*, 134 S.Ct. at 2531 ("Whether petitioners violate the Act depends not on what they say, but simply on where they say it.") (quotations omitted).  It applies equally to a vendor selling a bag of peanuts as it does to a vendor selling a magazine; it applies equally to a vendor selling a Cubs magazine as it would to a vendor selling a White Sox magazine.  And, while one could argue that the no peddling zone ordinance at Wrigley has the incidental effect of limiting sports related speech, "a facially neutral law does not become content based simply because it may disproportionately affect speech on certain topics."  *Id.*  As such, we would recommend that the District Court determine that the no peddling ordinance is content-neutral.

That being said, we turn to whether the ordinance is narrowly tailored to serve a significant governmental interest and whether it leaves open ample alternative channels

for communication of the information.  The governmental interest here is clear.  As maintained by the City, the no peddling zone was enacted in order to alleviate congestion and ensure public safety.  Such interests have long been considered significant.  *McCullen*, 134 S.Ct. at 2535 (recognizing the legitimacy of the government's interest in ensuring public safety and order and promoting the free flow of traffic on streets and sidewalks); *Heffron v. Int'l Soc. For Krishna Consciousness*, 452 U.S. 640, 650, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) ("As a general matter, it is clear that a State's interest in protecting the safety and convenience of persons using a public forum is a valid governmental objective").  More importantly, the testimony and objective evidence submitted in the record support the City's assertion that the ordinance in fact serves to advance its interests.

At the outset, it is worth noting that Wrigley Field, though an institution, creates unique problems for the City.  Not only does it stand directly in the middle of a bustling residential and commercial neighborhood with minimal parking, but unlike other sports complexes here in the city or elsewhere, it leaves a very small footprint.  (7/10/15 Hr'g Tr. at 100.)  According to testimony from Alderman Tunny, most stadiums have up to thirty acres of land to work with, whereas Wrigley Field occupies only about three acres.  (*Id.*)  Couple that small footprint with the tens of thousands of eager Cubs fans trying to get to the stadium on foot, by car, or by public transportation, and the City is left attempting to manage the area while still protecting the Constitutional rights of its

citizens.[11]

Alderman Tunney testified that prior to his proposal of the 2006 no peddling zone ordinance, he received numerous complaints regarding peddlers and street performers. Specifically, he received complaints that people were unable to enter the stadium in a safe manner and at times had to walk in the street. (7/10/15 Hr'g Tr. at 102.) He also received complaints that peddlers were blocking peoples' ability to traverse up and down the streets. (*Id.*) Alderman Tunny further testified that prior to the introduction of the no peddling ordinance he held meetings with members of the community, including peddlers and street performers. (*Id.* at 104-05.) At those meetings, the Alderman received additional complaints regarding access to the stadium and the inability to differentiate between Cubs property and the public sidewalks surrounding Wrigley. (*Id.* at 105.) Also raised at those meetings were concerns regarding the sale of counterfeit merchandise and the conduct of the peddlers. (*Id.*) All of this led to the introduction of the 2006 no peddling ordinance at issue here. (*Id.*)

Also submitted with the parties' briefs and at the hearing were video recordings of the areas surrounding Wrigley before and during various Cubs games this season. While those videos provide snapshots of only a few games, and at times show a varying number of fans near the stadium (*compare* Pl.'s Hr'g Ex. 6 *with* Defs.' Hr'g Ex. 2(a)), they clearly illustrate that the public sidewalks, which are particularly narrow in some places, can get extremely congested. Fans, coming from all directions, are funneled

---

[11] Recently, construction at Wrigley has caused even more problems due to the closure of certain streets and sidewalks. As Alderman Tunney explained, the City has permanently vacated the sidewalks immediately adjacent to Wrigley on Waveland and on Sheffield. (7/10/15 Hr'g Tr. at 122.) Those sidewalks are now Cubs property.

into the busy entrances at Clark and Addison and Sheffield and Addison.  At times, pedestrians walk in Addison street, which remains open to vehicular traffic before games.  (Defs.' Hr'g Ex. 2(c) & (d).)  Another video shows people exiting a City bus and beginning to form long lines for bag inspection starting on Cubs property and extending all the way back to the City sidewalks.  (Defs.' Hr'g Ex. 2(b).)  The videos also show *Chicago Baseball* vendors attempting to sell magazines on the sidewalks immediately adjacent to Wrigley, at times, in very congested areas of pedestrian traffic.  (Defs.' Hr'g Ex. 2(d).)  Fans can be observed walking around those vendors while they are either making a sale or attempting to make a sale.  (*Id.*)  Sergeant Hitiris also testified that he has told *Chicago Baseball* vendors to move to the side so as not to obstruct the sidewalk.  (7/21/15 Hr'g Tr. at 49-50.)

The evidence before the Court here can be distinguished from that presented by the City in *Weinberg*, 310 F.3d 1029.  Again, in that case, the 7th Circuit struck down the City's 1,000 foot ban on peddling surrounding the United Center.  The Court took issue with the lack of objective evidence demonstrating that plaintiff (selling a book), or any other peddler, created the problems of congestion asserted by the City in support of the ordinance.  *Id.* at 1040.  The Court gave little weight to what it viewed as "self-serving" testimony of police officers and security officials in light of a video tape showing that plaintiff's sale of his book did not interfere with pedestrian traffic and that the sidewalks were not in fact congested.  *Id.* at 1039.  That is not the case here.  Not only do we have the testimony of both Alderman Tunney and Sergeant Hitiris (self-serving may it be), but the video recordings from a few different game days show congestion on the sidewalks around Wrigley and *Chicago Baseball* vendors contributing to that

16

congestion.[12]

It naturally follows that other vendors, whether they be peddling magazines, t-shirts, or peanuts would contribute to the congestion were the ordinance not in effect. We note that plaintiff distinguishes itself and other "speech peddlers" from peddlers selling merchandise such as peanuts and t-shirts. According to the plaintiff, the City could, from a Constitutional standpoint, allow peddlers like itself selling printed matter to remain on the adjacent sidewalks, but require the peanut and t-shirt vendors to remain across the street. But as the City points out, what constitutes a speech peddler is not as clear cut as plaintiff makes it out to be. In *Ayres v. City of Chicago*, 125 F.3d 1010 (7th Cir. 1997), the court addressed a plaintiff's challenge to a City ordinance prohibiting him from selling T-shirts advocating for the legalization of marijuana in the majority of the downtown area. In doing so, the Court noted that there was "no question that the T-shirts are a medium of expression prima facie protected by the free-speech clause of the First Amendment ..." 125 F.3d at 1040. Thus, it is not so far-fetched to conclude that t-shirt vendors and other vendors might in fact fall under the ambit of plaintiff's "speech peddlers."

Plaintiff also argues that the under inclusive nature of the no peddling zone ordinance calls into question the City's supposed interest here. Plaintiff provides a laundry list of other activities it contends are permitted on the public sideways adjacent to Wrigley such as distributing fliers or free samples, charitable solicitation, and

---

[12] One could argue that the congestion that can still be seen this season, years after the no peddling zone ordinance was passed and the majority of peddlers moved across the street, shows that the City's ordinance does not advance its interests. But, again, the unique footprint of Wrigley Field makes it doubtful that there will ever come a time that those sidewalks surrounding the field are free of congestion.

commercial photography. Plaintiff presented photographs of individuals passing out coconut water, selling raffle tickets, seeking charitable donations, and of "fanfoto" representatives taking pictures of fans in front of Wrigley and the statues. (Pl.'s Hr'g Exs. 4(a)-(e), 5(a)-(b), 7, & 9.) According to plaintiff, such activities provide the same potential for congestion as do the *Chicago Baseball* vendors, if not more. But, contrary to the plaintiff's steadfast assertion, the evidence does not indicate that all of those activities are in fact permitted to take place on the public sidewalks.

First, no witness could say for certain whether those individuals depicted in the pictures were on the public way or on Cubs property. While Smerge maintained that he generally understood the red bricks spanning from the curb to be public sidewalk, Sergeant Hitiris was of the opinion that in some instances around the stadium the bricks are in fact on Cubs property.[13] (*Compare* 6/16/15 Hr'g Tr. at 82 *with* 7/21/15 Hr'g Tr. at 15, 55-56, 58.) According to Sergeant Hitiris, the Cubs allow "fanfoto" representatives to use their property to take pictures, and also allow certain charitable organizations to solicit on Cubs property. (7/21/15 Hr'g Tr. at 28-29, 55.) When Hitiris and his officers do see individuals soliciting charitable donations on the public way, they tell them to move to Cubs property or go across the street. (*Id.* at 28-29.) Hitiris and his officers also tell people passing out fliers to "stop and move along." (*Id.* at 61.) In any event, the fact that the no peddling ordinance does not cover every possible cause for congestion does not alone undermine the City's interest. *See Curtis v. Thompson*, 840

---

[13] Similarly, Smerge and Hitiris had a different response when asked about the width of the public sidewalks surrounding Wrigley. (*Compare* 6/16/15 Hr'g Tr. at 81-82 (10 feet) *with* 7/21/15 Hr'g Tr. at 15-16 (six feet)).

F.2d 1291, 1302 (7th Cir. 1988) ("Mere underinclusiveness does not, however, amount to constitutional infirmity."). All of this leads to a recommendation to the District Court that the City has a significant interest in alleviating congestion and ensuring public safety.

Having found the City has a significant interest, we turn to whether the no peddling ordinance is narrowly tailored to serve that interest. To be narrowly tailored, an ordinance must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S., at 799, 109 S.Ct. 2746. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *McCullen*, 134 S.Ct. at 2534-35 (quoting *Riley*, 487 U.S. at 795, 108 S.Ct. 2667). However, an ordinance need not be the "least restrictive or least intrusive" method for achieving the government's goal. *Milestone v. City of Monroe*, 665 F.3d 774, 784 (7th Cir. 2011) (quoting *Ward*, 491 U.S. at 798-99, 109 S.Ct. 2746).

At the outset, we note that the 7th Circuit expressly opined in *Weinberg* that a peddling ban "on the sidewalks immediately surrounding the United Center" would be "less encompassing and less intrusive on First Amendment rights" than the 1,000 foot ban the Court found unconstitutional. 310 F.3d at 1040. Of course, that was dicta and related to the United Center, so we still must independently assess the ordinance and record before us here. After doing so, we recommend to the District Court that the ordinance is narrowly tailored.

The no peddling zone is limited in geographic scope and does not expand further than is necessary to serve the City's interest. It applies only to the public sidewalks

19

immediately surrounding the stadium.[14]  In enacting the ordinance, the City specifically

chose to stay away from a 1,000 foot ban in order to burden less speech than was

necessary.  (7/10/15 Hr'g Tr. at. 106-107.)  Later, in 2009, Alderman Tunny attempted,

but was ultimately unsuccessful, at introducing an ordinance that would have covered

the sidewalks on a greater number of blocks surrounding the stadium.  (*Id.* at 107-108,

115; Defs.' Hr'g Exs. 1(c) & 9.)  Such a large geographical scope would have certainly

called into question whether that ordinance was narrowly tailored.  However, as it

stands now, the adjacent sidewalks ordinance is limited to the sidewalks where areas of

congestion are increased as pedestrians funnel into the stadium entrances from

different directions.

It is true, as plaintiff has argued, that Alderman Tunney and Sergent Hitiris

testified as to the ease of enforcement of the blanket ban on peddling on the sidewalks

surrounding Wrigley.  Citing to *McCullen*, plaintiff argues that the City has simply taken

the easiest approach, as opposed to a narrowly tailored approach.  In *McCullen*, the

Supreme Court examined a Massachusetts state law that set forth 35-foot buffer zones

surrounding abortion clinics in order to prevent harassment, promote public safety, and

prevent congestion.  At various abortion clinics, the buffer zones essentially forced

"sidewalk counselors" well-back from the clinic entrances, thereby seriously burdening

their ability to convey their message.  In striking down the law, the Court emphasized,

among other things, that the State failed to consider a number of alternative measures

---

[14] Again, since the City has vacated the sidewalks on Waveland and Sheffield to the Cubs, the no peddling zone ordinance only applies to the public sidewalks adjacent to the stadium along Addison and Clark, and to a portion of the corners at Clark and Waveland and Addison and Sheffield.  (*See* Defs.' Hr'g Ex. 1(d).)

available that would serve its interests, "without excluding individuals from areas historically open for speech and debate." *McCullen*, 134 S.Ct. at 2539.

Here, plaintiff suggests the City could use alternatives to the blanket ban such as enforcing the disorderly conduct statute already on the books, passing an ordinance targeting obstruction of the sidewalks, or limiting the number of peddlers on the sidewalks immediately adjacent to the Field. However, given the unique footprint at Wrigley and the undisputed congestion, permitting any peddlers, even in small numbers may leave the City unable to advance its significant interests. And even if the court accepted the plaintiff's proposed "less-speech-restrictive" alternatives as just that, a court need not deem an ordinance invalid where, as here, the means chosen are not substantially broader than necessary to achieve the City's interest. *Ward*, 491 U.S. at 800, 109 S.Ct. 2746.

Undoubtedly, the no peddling ordinance also leaves open ample alternative channels of communication for plaintiff and other peddlers and does not render their voices essentially mute as did the ordinance in *McCullen*. It is undisputed that peddling is permitted on the corners and streets immediately across from the stadium. Videos show that pedestrians come from all directions as they travel towards the field. While vendors may not have immediate access to fans exiting city buses and taxis, vendors remain in plain view and earshot of those fans and all of the other fans traversing the sidewalks towards the stadium. Loyal *Chicago Baseball* fans could certainly spot the bright shirts of the vendors just across the street and all vendors could capture the attention of their target audience. Though those streets and corners may not be the peddlers' preferred selling spots, that does not render the ordinance unconstitutional.

21

*See Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011) (upholding a police directive for protestors to move across the street from Wrigley during the Gay Games because protestors had "ample opportunity to capture the attention of the Games attendees").  In our view, the ordinance is narrowly tailored to serve the City's significant interest and leaves open ample alternative methods of communication.

For all of these reasons, we conclude that the plaintiff has not shown a likelihood of success on the merits as to the no peddling zone ordinance.  Having reached this conclusion, we need not delve into the remaining threshold elements for a preliminary injunction and recommend that the District Court deny plaintiff's motion for a preliminary injunction as it relates to the no peddling zone ordinance.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008) ("If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction.").

## 2.    Peddling License Ordinance

Plaintiff also brings an as applied and facial challenge to Section 4-244-030, which, again, requires all peddlers to obtain a peddler's license from the City.[15]  The license can be obtained through the City's Department of Business Affairs and Consumer Protection during regular business hours, usually in about an hour, and costs $100 for a two-year period.[16]  (7/10/15 Hr'g Tr. at 17-19, 24.)  Each individual vendor must have his own license and must display a badge that includes his name, picture,

---

[15] Though it is undisputed that neither Smerge nor any other vendors have ever applied for a peddler's license, the City has not expressly challenged plaintiff's standing to attack the ordinance.

[16] A discounted fee of $50 is available to veterans, anyone with a physical disability, and anyone over the age of 65.  (7/10/15 Hr'g Tr. at 24.)

and license expiration date.  (*Id.* at 38, 51.)  The peddler's home address is listed on the back side of the badge.  (*Id.* at 38.)  Relying primarily on *Watchtower v. Stratton*, 526 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002), plaintiff asserts an overbreadth challenge, arguing that the license requirement violates the First Amendment as it relates to printed matter because it inhibits one's ability to speak anonymously or spontaneously, and results in "economic favoritism."[17]  We disagree.

The plaintiffs in *Watchtower* were various groups that coordinated and supervised the preaching efforts of Jehovah's Witnesses.  Those plaintiffs facially challenged a Village of Stratton ordinance making it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and receiving a permit.  In striking down the ordinance, the Court first recognized the "historical importance of door-to-door canvassing and pamphleteering as vehicles for the dissemination of ideas."  *Watchtower*, 536 U.S. at 162, 122 S.Ct. 2080.  The Court then took issue with the broad amount of speech that the ordinance covered, including non-commercial canvassing for religious, political, and other causes.  *Id.* at 165-66, 122 S.Ct. 2080.  Of further concern to the Court was the dampening effect the ordinance had on one's ability to speak anonymously and spontaneously.  *Id.* at 166-68, 122 S.Ct 2080.

The peddling license scheme here can be distinguished from that in *Watchtower.* The ordinance does not involve activity such as door-to-door canvassing, but instead targets the sale of merchandise, including printed matter (other than newspapers), on the public way.  To be clear, the ordinance is content-neutral.  "To qualify as

---

[17] We note that plaintiff has not asserted a prior restraint claim.

content-neutral, a permit policy cannot invest 'unbridled discretion' in the person who decides whether a permit will issue because excessive discretion can lead to discriminatory enforcement." *Smith v. Executive Director of Indiana War Memorials Com'n*, 742 F.3d 282, 289 (7th Cir. 2014) (citations omitted). The ordinance affords the City minimal, if any, discretion in choosing to grant or deny an application for a peddler's license. The ordinance provides that the "commissioner of business affairs and consumer protection *shall issue* a peddler's license to an applicant who tenders a completed, accurate application and the appropriate fee, unless issuance of a license is prohibited under subsection (b)." Municipal Code of Chicago § 4-244-041(a) (emphasis added). Subsection (b) only bars the issuance of a license if the applicant is under 16, or if an applicant's previous license has been revoked within the previous year, or is otherwise suspended. John Castenada, a Supervisor at the Department of Business Affairs and Consumer, also explained that each applicant needs an Illinois Business Tax ID, and that City officials do check to ensure that an applicant is not in debt to the City (for parking tickets, water bills, etc.). (7/10/15 Hr'g Tr. at 23, 45-46.) Despite these additional requirements, the minimal discretion afforded the City under the current licensing scheme differs from the City's previous ordinance, which granted "unfettered discretion" to the City and which was held unconstitutional as a prior restraint in *Weinberg*, 310 F.3d at 1044.

More importantly, the City officials do not examine the content of items that peddlers offer for sale. For example, if a peddler reported he intended to sell t-shirts, the City official would not examine the t-shirt or seek further specification as to any message on the shirt. (7/10/15 Hr'g Tr. at 49.) The fee is also the same no matter what

24

item is being sold.  Thus, there is no indication that the licensing ordinance serves to restrict certain speech due to its content.

The City also has a significant interest in promoting public safety, ensuring the payment of taxes, and providing a mechanism for policing fraudulent peddling activity. Even the *Watchtower* court recognized such interests as important.  *See Watchtower*, 536 U.S. at 164-65, 122 S.Ct. 2080.  The ordinance serves to advance those interests by ensuring each peddler has a Tax ID number and that a peddler can be contacted in response to customer complaints or in the case of fraudulent transactions.  As it applies to magazines such as *Chicago Baseball*, the ordinance serves to ensure that individuals are not selling stolen or free magazines on the public way.  Because the requirement that a peddler hold a license is aimed at commercial transactions, it is properly tailored to serve the City's interests here and not overly broad.  *See Watchtower*, 536 U.S. at 165, 122 S.Ct. 2080 ("Had this provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud.").

Similarly, under this licensing scheme, plaintiff's complaints of a loss of spontaneity and anonymity fall short because the same concerns present in *Watchtower* regarding the broad amount of speech covered and the historical importance of door-to-door canvassing are not at the forefront here.  Like defendants, we also point out that the plaintiff has failed to advance any significant argument on its assertion of "economic favoritism."

For all of these reasons, we again conclude that the plaintiff has failed to show a

likelihood of success on the merits as to the peddling license requirement and need not address the remaining threshold requirements for a preliminary injunction.

## IV.     Conclusion

For the reasons stated above, we respectfully recommend that the District Court deny plaintiff's motion for preliminary injunction as to both ordinances at issue. Specific written objections to this Report and Recommendation may be served and filed within fourteen (14) days from the date that this order is served. Fed. R. Civ. P. 72. Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the Report and Recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

**ENTERED:**

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: July 29, 2015**