**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEFT FIELD MEDIA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 3115 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| CITY OF CHICAGO and ELIAS VOULGARIS, | ) | |
| Chicago Police Commander, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is (1) Magistrate Judge Mason's Report and Recommendation of July 29, 2015 [63] (as amended on August 28, 2015 solely to add citations to hearing transcripts [78]), which is adopted in its entirety; and (2) plaintiff's motion for a preliminary injunction [33], which is denied.

## BACKGROUND

Plaintiff, Left Field Media LLC ("Left Field"), is a company that publishes a magazine called *Chicago Baseball* that is issued four times per year during the major league baseball season. Left Field sells the magazine for $2.00 on the public ways surrounding Wrigley Field before Chicago Cubs home games. This suit arises out of the events that occurred on April 5, 2015, the day of the Cubs' 2015 home opener. Matthew Smerge, who owns Left Field and serves as the publisher and editor of *Chicago Baseball*, was selling the magazine on the public way at the northeast corner of Clark and Addison Streets when Chicago Police Commander Elias Voulgaris approached Smerge and told him that he and his vendors had to move across the street and that Voulgaris would ticket any vendor he saw on the Cubs' side of the street. Despite this

warning, Smerge continued to sell magazines from the same spot, and about a half-hour later, Voulgaris issued him a ticket for selling *Chicago Baseball* in a no-peddling zone and warned Smerge that if he did not move to the other side of the street, he would be arrested. Smerge then moved across the street, where Left Field alleges that it suffered reduced sales.

Three days later, on April 8, 2015, Left Field filed this action, which seeks injunctive, declaratory, and monetary relief against Voulgaris and the City of Chicago (the "City") for alleged violations of plaintiff's First Amendment rights. Plaintiff brings as-applied and facial challenges to three sections of the Chicago Municipal Code: (1) Section 4-244-140, which prohibits all peddling on the public ways adjacent to Wrigley Field (the "Adjacent-Sidewalks Ordinance," which Smerge was ticketed for violating, R. 72-3); (2) Section 4-244-030, which requires peddlers to first obtain a peddling license (the "Peddler's License Ordinance"); and (3) Section 10-8-520, which provides that no person other than a licensed peddler shall sell any article or service, except newspapers, on any public way. (R. 1, Compl.)

The day after filing this suit, plaintiff moved for a temporary restraining order ("TRO") to enjoin defendants from interfering with plaintiff's access to the public sidewalks adjacent to Wrigley Field for the purpose of selling *Chicago Baseball* during Cubs home games. (R. 5.) This Court granted the motion, entered a TRO, and referred the case to Magistrate Judge Mason for a preliminary injunction hearing. The TRO was then extended by agreement at times and most recently by this Court until its ruling on plaintiff's preliminary-injunction motion.

On June 16, July 10, and July 21, 2015, Judge Mason held an evidentiary hearing on plaintiff's motion for a preliminary injunction.[1] In its motion, plaintiff seeks to enjoin defendants from enforcing the Adjacent-Sidewalks Ordinance and the Peddler's License Ordinance. Judge Mason issued a Report and Recommendation on July 29, 2015, recommending that this Court deny plaintiff's motion.[2] (R. 63.) On August 13, 2015, plaintiff objected to Judge Mason's Report and Recommendation as provided by Federal Rule of Civil Procedure 72 and 28 U.S.C. § 636(b)(1). (R. 70.) On August 27, 2015, defendants responded to plaintiff's objections. (R. 76.)

## DISCUSSION

### A. Legal Standards

#### 1. Standard of Review

"When a magistrate judge prepares a report and recommendation for a district court, the governing statute provides that the district court 'shall make a *de novo* determination' with respect to any contested matter." *Kanter v. C.I.R.*, 590 F.3d 410, 416 (7th Cir. 2009) (quoting 28 U.S.C. § 636(b)). The Court of Appeals has observed:

> *De novo* review requires the district judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion. The district judge is free, and encouraged, to consider all of the available information about the case

---

[1] Although there is no document on the case docket titled "Plaintiff's Motion for a Preliminary Injunction," Document Number 33, which is titled "Plaintiff's Memorandum in Support of Its Motion for a Preliminary Injunction," was docketed as a motion and has been designated as a pending motion, and the Court and the parties have treated it as a motion.

[2] On August 28, 2015, Judge Mason issued an Amended Report and Recommendation ("Am. R & R") to add citations to the proper page numbers of the official hearing transcripts, which were not yet available at the time the original Report and Recommendation was issued. (R. 78, Am. R & R at 1 n.1.)

3

when making this independent decision. A district judge may be persuaded by the reasoning of a magistrate judge or a special master while still engaging in an independent decision-making process.

*Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013) (citing *United States v. Raddatz*, 447 U.S. 667, 676 (1980)). The district judge makes the ultimate decision to adopt, reject, or modify the magistrate judge's recommendation. *Schur v. L.A. Weight Loss Ctrs., Inc.*, 577 F.3d 752, 760 (7th Cir. 2009); *see also* Fed. R. Civ. P. 72.

### 2. Preliminary Injunctions

"'A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (brackets and emphasis omitted) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). It is "often seen as a way to maintain the *status quo* until merits issues can be resolved at trial." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 783 (7th Cir. 2011). The Court of Appeals has described the proper analysis as follows:

> In our circuit, a district court engages in a two-step analysis to decide whether such relief is warranted. In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits. If the movant makes the required threshold showing, then the court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the "public interest"). The court weighs the balance of potential harms on a "sliding scale" against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor.

*Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). The threshold for establishing likelihood of success is relatively low. *U.S. Army Corps*, 667 F.3d at 782. In First Amendment cases like this one, the likelihood of success is usually the decisive factor because the loss of First Amendment freedoms "unquestionably constitutes irreparable injury," and "injunctions protecting First Amendment freedoms are always in the public interest." *Wis. Right To Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014).

**B.     The Adjacent-Sidewalks Ordinance (§ 4-244-140)**

Section 4-244-140, the Adjacent-Sidewalks Ordinance, provides as follows in relevant part:

> No person shall peddle any merchandise on the sidewalk immediately adjacent to Wrigley Field; such sidewalk consisting of the north side of Addison Street, the east side of Clark Street, the south side of Waveland Avenue, and the west side of Sheffield Avenue. For purposes of this subsection (b), the term "sidewalk" shall mean that portion of the public way extending from the perimeter of the Wrigley Field stadium structure to the street curb or curb line.

Chi., Ill., Mun. Code § 4-244-140(b).[3]

Sidewalks like the ones outside Wrigley Field "are traditional public forums where the exercise of First Amendment rights is often most vibrant. As the Supreme Court has described the rationale for promoting broad access to public forums, 'streets, sidewalks, parks and other similar public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly and absolutely.'" *Marcavage v. City of Chi.*, 659 F.3d 626, 630 (7th Cir. 2011) (quoting *Carey v. Brown*, 447 U.S. 455, 460 (1980)). "However, the fact that such rights cannot be denied 'broadly and absolutely' does not mean they cannot be curtailed at all. On the contrary,

---

[3]This particular provision of this section was enacted in 2006. (7/10/15 Hr'g Tr. 102-03.)

the time, place, and manner of a speaker's activities can be regulated without violating the First Amendment so long as the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication." *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

After hearing testimony and reviewing the parties' exhibits and briefs, Judge Mason determined that the Adjacent-Sidewalks Ordinance (hereinafter, in this section of the opinion, the "Ordinance") is content neutral on its face and a reasonable "time, place, or manner" regulation under the test set forth in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989).[4] In Judge Mason's view, the Ordinance is valid under the First Amendment, so plaintiff has not shown a likelihood of success on the merits.

### 1.      Content Neutrality

Plaintiff, citing *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218 (2015) and *Norton v. City of Springfield, Illinois* ("*Norton II*"), No. 13-3581, 2015 WL 4714073 (7th Cir. Aug. 7, 2015), first challenges Judge Mason's determination that the Ordinance is content neutral.

Some background about *Reed* and *Norton* is required. In its first decision in the *Norton* proceedings, the Court of Appeals affirmed the district court's denial of plaintiffs' motion to preliminarily enjoin enforcement of the City of Springfield's panhandling ordinance. *Norton v. City of Springfield, Ill.* ("*Norton I*"), 768 F.3d 713 (7th Cir. 2014). In *Norton I,* the Court reasoned that the panhandling ordinance does not draw lines based on the content of anyone's speech. *Id.* at 714, 717-18. On June 18, 2015, the Supreme Court issued *Reed*. Shortly

---

[4]As Judge Mason noted, defendants do not argue that the Court should apply the standard of scrutiny for "commercial speech."

thereafter, in *Norton II*, the Court of Appeals granted plaintiffs' petition for rehearing, applied *Reed* to the City of Springfield's panhandling ordinance, reversed the judgment of the district court, and remanded the case for entry of an appropriate injunction. The Court explained:

Plaintiffs contend that the ordinance's principal rule—barring oral requests for money now but not regulating requests for money later—is a form of content discrimination.

The panel disagreed with that submission for several reasons. We observed that the ordinance does not interfere with the marketplace for ideas, that it does not practice viewpoint discrimination, and that the distinctions that plaintiffs call content discrimination appear to be efforts to make the ordinance less restrictive, which should be a mark in its favor. We summed up: "The Court has classified two kinds of regulations as content-based. One is regulation that restricts speech because of the ideas it conveys. The other is regulation that restricts speech because the government disapproves of its message. It is hard to see an anti-panhandling ordinance as entailing either kind of discrimination." 768 F.3d at 717 (citations omitted). We classified the ordinance as one regulating by subject matter rather than content or viewpoint.

*Reed* understands content discrimination differently. It wrote that "regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." 135 S. Ct. at 2227 (emphasis added). Springfield's ordinance regulates "because of the topic discussed". The Town of Gilbert, Arizona, justified its sign ordinance in part by contending, as Springfield also does, that the ordinance is neutral with respect to ideas and viewpoints. The majority in *Reed* found that insufficient: "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." 135 S. Ct. at 2228. It added: "a speech regulation targeted at specific subject matter is content based even if it does not discriminate among viewpoints within that subject matter." *Id.* at 2230.

Three Justices concurred only in the judgment in *Reed*. 135 S. Ct. at 2236-39 (Kagan, J., joined by Ginsburg & Breyer, JJ.). Like our original opinion in this case, these Justices thought that the absence of an effort to burden unpopular ideas implies the absence of content discrimination. But the majority held otherwise; that's why these three Justices wrote separately. The majority opinion in *Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification.

Our observation, 768 F.3d at 717, that Springfield has attempted to write a narrowly tailored ordinance now pertains to the justification stage of the analysis rather than the classification stage. But Springfield has not contended that its ordinance is justified, if it indeed represents content discrimination. As we said at

the outset, the parties have agreed that the ordinance stands or falls on the answer to the question whether it is a form of content discrimination. *Reed* requires a positive answer.

*Norton II*, 2015 WL 4714073, at *1-2.

Plaintiff argues that Judge Mason's "formulation of the meaning of 'content-based,'" reliance on *Norton I*, and determination that the Adjacent-Sidewalks Ordinance is content neutral was mistaken in light of *Reed*. (R. 70, Pl.'s Objections at 2.)[5] In plaintiff's view, "the City's scheme of favoring one organ of communication (newspapers) over all others (magazines, books, pamphlets, leaflets) amounts to content-based discrimination." (*Id.* at 3.)

As Judge Mason pointed out, plaintiff's motion does not seek to enjoin the enforcement of the newspaper exemption in § 10-8-520. (R. 78, Am. R & R at 3 n.4.) Yet plaintiff's sole basis for its argument that the Adjacent-Sidewalks Ordinance is content-based is the entirely separate newspaper exemption. (R. 70, Pl.'s Objections at 2-6.) By invoking the City's "scheme," plaintiff assumes, without discussion, that the newspaper exemption in § 10-8-520 applies to the Adjacent-Sidewalks Ordinance. Defendants, for their part, note that Judge Mason as well as other courts[6] have assumed that the Ordinance exempts newspaper peddlers, and defendants contend that "whether such a carve-out exists is a question of state law properly

___

[5]As defendants note (R. 76, Defs.' Resp. at 2-3 n.2), plaintiff's first mention of *Reed* in these proceedings appears in its Objections, although the decision was issued weeks before the second and third sessions of the preliminary injunction hearing. Although *Reed* was not issued prior to the conclusion of briefing on plaintiff's motion, plaintiff did not seek to file any supplemental brief to address the decision.

[6]Defendants cite only *Weinberg v. City of Chicago*, 310 F.3d 1029 (7th Cir. 2002), in which the Court of Appeals treated the newspaper exemption in § 10-8-520 as part of the City's ordinance that prohibited the peddling of "merchandise of any type on any portion of the public way within 1,000 feet of the United Center," § 4-244-147. *Id.* at 1034-36. Unlike the Adjacent-Sidewalks Ordinance, § 4-244-147 contained a sentence stating that "[t]he provisions of this section shall be in addition to any other limitation on or regulation of peddlers."

decided by the Illinois courts" and "is not squarely presented in this case [because] Plaintiff does not contend that its publication is a newspaper." (R. 76, Defs.' Resp. at 6 n.5.)

The Court agrees that plaintiff has not "squarely presented" the issue, but not because it fails to argue that *Chicago Baseball* is a newspaper. After all, the Court of Appeals addressed the issue in *Weinberg* even though it appears that the plaintiff did not present such an argument. (Rather, the plaintiff argued that his publication was a book and that the Court should have extended the exemption to books.) Because plaintiff fails to develop an argument for treating the newspaper exemption as part of the Adjacent-Sidewalks Ordinance, the Court will not do so. There is no indication in the language of the Ordinance that it incorporates or is subject to § 10-8-520. And even if there were, plaintiff has not explained why, if § 10-8-520 were found to be unconstitutional, the appropriate remedy would extend any further than the invalidation of that particular section.[7] Plaintiff's motion, however, does not seek to enjoin enforcement of § 10-8-520.

Pursuant to the framework set out in *Reed*, the Court must first determine whether the Adjacent-Sidewalks Ordinance is content neutral on its face. *See* 135 S. Ct. at 2228. The Ordinance is facially content neutral—it simply bans the peddling of any merchandise on the sidewalks immediately adjacent to Wrigley Field—so it clears this hurdle. Furthermore, even if the newspaper exemption can be considered part of the Adjacent-Sidewalks Ordinance, its

---

[7]Typically, when a statutory scheme has a constitutional flaw, the reviewing court will sever the offending portion from the remaining constitutional portions of the law. *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006) ("Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer, for example, to enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact.") (citations omitted).

inclusion would not render the Ordinance content-based under *Reed* and *Norton II*. The Supreme Court stated in *Reed* that "a speech regulation is content based if the law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2231. In *Norton II*, the Court of Appeals summarized *Reed*'s teaching as follows: "Any law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification." 2015 WL 4714073, at *2. Assuming that the Adjacent-Sidewalks Ordinance is a restriction on speech and not merely a regulation of conduct, it does not draw any distinctions based on the meaning of speech, the topic discussed, or any message expressed. The newspaper exemption distinguishes between forms of publications, not their content. In his *Reed* concurrence, which was joined by Justices Kennedy and Sotomayor, Justice Alito provided a list of sign regulations that would not be content based, including "[r]ules regulating the size of signs" and "[r]ules distinguishing between signs with fixed messages and electronic signs with messages that change." 135 S. Ct. at 2233. In the Court's view, the newspaper exemption is akin to these types of regulations. The Court is unpersuaded by plaintiff's assertions that "distinctions among organs of communication are content-based by their very nature" and that the exemption is "speaker-based" and a "subtle" form of content discrimination. (R. 70, Pl.'s Objections at 3-4.) Even if the newspaper exemption were properly considered part of the Adjacent-Sidewalks Ordinance, it does not amount to a content-based distinction.

In the second step of the *Reed* analysis, a facially content-neutral law can still be categorized as content based if it cannot be "'justified without reference to the content of the regulated speech'" or if it was adopted by the government "'because of disagreement with the message the speech conveys.'" 135 S. Ct. at 2227 (brackets omitted) (quoting *Ward*, 491 U.S. at 791). The City's justification for the Adjacent-Sidewalks Ordinance—its interest in alleviating

congestion and ensuring public safety on the sidewalks and streets surrounding Wrigley Field—is content neutral. Plaintiff again focuses exclusively on the newspaper exemption, which the Court does not consider to be part of the Adjacent-Sidewalks Ordinance; nonetheless, the Court will assume that it is for the sake of argument. There is no evidence (and plaintiff does not argue) that the City adopted the exemption because of a disagreement with anyone's message. Plaintiff does contend that the City has failed to present a valid content-neutral justification for the exemption. (R. 70, Pl.'s Objections at 5.) But Judge Mason's reliance on *Weinberg*, in which the Court of Appeals stated that "[s]elling goods or merchandise would create a greater disruption than selling a 50¢ newspaper," 310 F.3d at 1036, was not improper. Plaintiff's real dispute is with the Court of Appeals's conclusions in *Weinberg*, which this Court must follow.[8]

Reed and *Norton II* clarified the content-neutrality inquiry, but they do not change the outcome. This Court's conclusion is the same as Judge Mason's: the Adjacent-Sidewalks Ordinance is content neutral. Thus, the Court does not apply strict scrutiny. *See McCullen v. Coakley*, 134 S. Ct. 2518, 2534 (2014).

---

[8]Plaintiff attempts to distinguish its $2.00 magazine from the book at issue in *Weinberg* by emphasizing *Weinberg*'s observation that "[a] book purchase is usually more expensive, more time consuming, and more absorbing than a simple newspaper purchase." (R. 70, Pl.'s Objections at 5 (citing *Weinberg*, 310 F.3d at 1036).) As to the possibly "time consuming" and "absorbing" nature of the purchase, plaintiff's argument is belied by the testimony of Smerge, who acknowledged that on occasion he has conversations with magazine purchasers. (*See, e.g.*, 6/16/15 Hr'g Tr. 81 ("If they say they like the magazine and they ask a couple of questions, I may divulge that I am the editor."; *id.* 86-87 (explaining that there are times when people ask about the difference between *Chicago Baseball* and the Cubs' program and that Smerge responds by providing "a short, concise explanation of what the difference is"); *id.* 134 ("We actually have regulars who are devoted enough that they keep buying the same edition. . . . I've had people tell me that they support what we do, we're an independent, honest voice; and they buy it every time they come . . . .").)

## 2.        Narrow Tailoring and Alternative Channels

The Court turns to whether the Adjacent-Sidewalks Ordinance is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels for communication of [] information." *Id.* at 2529 (citing *Ward*, 491 U.S. at 791). "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 2535 (quoting *Ward*, 491 U.S. at 799). Such a regulation need not be the least restrictive or least intrusive means of serving the government's interests, but it nevertheless cannot burden substantially more speech than is necessary to achieve those interests. *Id.*

Judge Mason determined that the Ordinance is narrowly tailored. The evidence is that the Adjacent-Sidewalks ordinance was enacted to alleviate congestion and ensure public safety on the sidewalks next to Wrigley Field. Judge Mason found that the testimony and record evidence support the City's assertion that the Ordinance in fact advances these interests, and he concluded that the Ordinance does not burden substantially more speech than is necessary to achieve them. (R. 78, Am. R & R at 14-22.)

Plaintiff does not expressly dispute the significance of the City's interests, but attempts to recharacterize them and the evidence, asserting that "[i]t is certainly a valid state interest to prevent obstruction of pedestrian traffic, but it is not a valid state interest to seek to rid the streets of simple, everyday 'congestion.'" (R. 70, Pl.'s Objections at 14.) In plaintiff's view, "'obstruction' can and must be distinguished from the mere existence of 'congestion' on a public

forum." (*Id.*)[9]   Pedestrian traffic, however, is not a phenomenon confined to just two possibilities, obstruction and the lack thereof.[10]   Human experience tells us that such traffic is on a continuum; the more congestion, the more likely it is that obstruction will occur.  In any event, the Supreme Court has repeatedly recognized that the government has a strong interest in "promoting the free flow of traffic" on public streets and sidewalks.  *McCullen*, 134 S. Ct. at 2535; *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994).[11]

Plaintiff faults Judge Mason's rejection of its suggestion that the City has a variety of alternative methods of advancing its interests.  (R. 70, Pl.'s Objections at 7-8; R. 78, Am. R & R at 21; R. 33, Pl.'s Mem. at 18.)  In determining that these alternatives may not enable the City to advance its interests, Judge Mason cited the "unique footprint" of Wrigley Field and the undisputed congestion in its immediate vicinity.  (R. 78, Am. R & R at 21.)  Plaintiff submits that "uniqueness" is not "an appropriate limiting principle" and that Wrigley Field is "not in fact 'unique,' at least not in respects relevant to this lawsuit[,]" because "the width of the pedestrian

_____

[9]In another section of its brief, plaintiff makes a somewhat contradictory point: "[O]ne must ask, where does 'congestion' start and the hustle, bustle, and energy of a busy city sidewalk end?" (R. 70, Pl.'s Objections at 9.)  So perhaps plaintiff in fact does dispute the significance of the City's interest.  That position would be contrary to controlling case law.  *See, e.g.*, *McCullen*, 134 S. Ct. at 2535.

[10]Moreover, the evidence here does not show mere "simple, everyday congestion," as discussed below.

[11]Plaintiff also attempts to narrow the government's interest to "address[ing] any alleged harms of obstruction posed by speech peddlers."  (R. 70, Pl.'s Objections at 7.)  The Adjacent-Sidewalks Ordinance applies to all peddlers, not just "speech peddlers."  And in examining the government's justification for its regulation, the Court does not look only at plaintiff's activity.  *See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 652 (1981) (recognizing that groups other than the plaintiffs must be considered when assessing the government's interest in avoiding congestion and maintaining the orderly movement of state-fair patrons on fairgrounds).

walkways surrounding Wrigley Field is roughly consistent with that available around other sports stadiums in Chicago."[12]  (R. 70, Pl.'s Objections at 9-10.)

The evidence is that the area surrounding Wrigley Field indeed creates unique problems for the City, as Judge Mason found.  Alderman Tom Tunney testified that Wrigley Field has a "very small footprint" compared with other sports arenas; most stadiums have about thirty acres of land to work with, as opposed to Wrigley Field's three acres.  (7/10/15 Hr'g Tr. 100.)  The area immediately surrounding the ballpark is bustling, with a high density of retail establishments, rooftop businesses, and residences.  There are no vast swaths of parking lots around Wrigley; the park is uniquely hemmed in, and the flow of pedestrian traffic to the stadium is confined to the public ways.  (R. 74-1, Defs.' Ex. 1(a).)  The surrounding sidewalks around game times are so congested that people often walk in the streets alongside the sidewalks.  (R. 74-2, Defs.' Ex. 2, Videos.)  Because of the stadium's position, a certain portion of the sidewalk on the north side of Addison between Clark and Sheffield is extremely narrow; only about three people at a time can pass in that section.  (*Id*. Ex. 2(b).)  The location of the

_____

[12]On this point, plaintiff submits the Declaration of Neil Ament, one of its attorneys, who states that he used a tape measure to measure the public and private ways surrounding Wrigley Field.  He sets out his measurements and calculations of the sidewalk widths there and compares them to the widths of the sidewalks around U.S. Cellular Field and the United Center.  (He fails to state the basis for his statements about the widths of the sidewalks surrounding those two venues.)  (R. 70-1, Decl. of Neil S. Ament.)  Plaintiff did not present this evidence to Judge Mason, and defendants object to the Declaration on the grounds that it was not previously disclosed, lacks a foundation, and runs afoul of the advocate-witness rule.  (R. 76, Defs.' Resp. at 23-24.)  Although this Court's review is *de novo*, a party generally cannot raise new arguments and evidence that were not presented to the magistrate judge.  *See United States v. Melgar*, 227 F.3d 1038, 1040 (7th Cir. 2000); *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995) (a *de novo* determination is not the same as a *de novo* hearing).  The Court will not consider the Declaration.  Plaintiff had every opportunity to present such evidence to Judge Mason and failed to do so.  And even if the Court considered the Declaration, it is unavailing for the reasons explained below.  The area surrounding Wrigley Field is unique regardless of whether the widths of its adjacent sidewalks are comparable to those of the sidewalks surrounding U.S. Cellular Field or the United Center.

CTA Addison Red Line stop contributes to the congestion because it is so close to the east side of the stadium. (7/10/15 Hr'g Tr. 133.) Alderman Tunney also testified that in the three-year period before the Adjacent-Sidewalks Ordinance was enacted in 2006, he had received complaints about peddlers and street performers blocking the entrances to the ballpark and making it difficult to safely walk in the area. (*Id.* 102, 105-06.) Judge Mason did not, as plaintiff submits, (R. 70, Pl.'s Objections at 11), give "undue emphasis" to the problems posed by Wrigley Field's unique characteristics.

Plaintiff contends that "[i]f Wrigley Field were truly 'unique' in such a way that a wholesale ban on speech peddling were justified, there would surely be some evidence of problems occurring as a result of Plaintiff's vendors' presence there." (R. 70, Pl.'s Objections at 10-11.) This evidence is in the record. Given the City's significant interest in alleviating sidewalk congestion and ensuring public safety, the Court disagrees with plaintiff that the only possible "problems" are confined to "accidents, injuries or arrests resulting from speech peddlers' presence." (R. 70, Pl.'s Objections at 11-12.) *See Marcavage*, 659 F.3d at 630-31 & n.2 (discussing the pedestrian traffic on the sidewalks surrounding Wrigley Field during the closing ceremonies of the Gay Games and the protestor plaintiffs' interference with that traffic and noting that "[t]hough the plaintiffs argue they were not blocking the sidewalks, their own video recordings taken at the events plainly show pedestrians walking around them while they remain stationary.").[13] Alderman Tunney and Sergeant Evangelos Hitiris testified about the congested sidewalks around Wrigley Field. Defendants's videos depict *Chicago Baseball*

---

[13]Plaintiff's argument to the contrary, which attempts to distinguish between the act of "obstructing" others and that of "allow[ing] people to freely and easily walk around" oneself, is thus unpersuasive. (*See* R. 70, Pl.'s Objections at 14-15.)

vendors contributing to the congestion by attempting to sell the magazine on the sidewalks immediately adjacent to Wrigley Field, while pedestrians must walk around them. (R. 74-2, Defs.' Ex. 2, Videos.) Smerge also conceded that people sometimes have to walk around him when he is making sales or having conversations with customers. (6/16/15 Hr'g Tr. 86-87.)

Plaintiff asserts that the City has failed to show, as required by *McCullen*, that the alternative measures plaintiff has identified "would fail to achieve the government's interests" and "not simply that the chosen route is easier." *See* 134 S. Ct. at 2540. The Court disagrees. There is unrebutted evidence that plaintiff's proposed alternatives—enforcing the disorderly-conduct ordinance, passing an ordinance targeting sidewalk obstruction, or passing an ordinance limiting the number of peddlers around Wrigley Field or requiring a certain amount of space between them, or prohibiting peddling that blocks egress or ingress to the stadium—would be ineffective and unworkable due to the police department's limited manpower. Sergeant Hitiris, who is in charge of a seven-officer unit that is assigned to the Wrigley Field area for game days and nights as well as concerts, testified that the police do not have the manpower to enable them to "sit every five feet to determine whether somebody is being legal or not." (7/21/15 Hr'g Tr. 6-7, 31, 65-66.) The area Hitiris's unit patrols is much larger than just the block on which the stadium sits; it is bordered by Grace Street on the north, Roscoe Street on the south, Racine Avenue on the west, and Halsted Street on the east. (*Id.* 6.) The officers are responsible for coordinating with stadium security personnel, being watchful for security threats, and responding to "key policing issues" on game days, such as unlawful peddling, scalping, fighting, theft, drinking on the public way, and public indecency and urination. (*Id.* 9-10, 14-15.) In 2014, Hitiris's unit issued 968 tickets (in lieu of arrests) on game days for various offenses in the Wrigley Field area, including tickets for unlawful peddling. (*Id.* 11.) A few hours prior to a

game, there can be 10,000 to 15,000 people in the area; by the start of a game, there can be more than 40,000. (*Id.* 12.)

Given these conditions, the Court agrees with defendants that the alternatives plaintiff proposes would not enable the City to serve its interests. Plaintiff asserts repeatedly that "there are alternatives the City could use," (R. 70, Pl.'s Objections at 7-8), but under *Ward*, the mere existence of alternatives is not dispositive. 491 U.S. at 798-99 (a regulation of the time, place, or manner of protected speech must be narrowly tailored but "need not be the least restrictive or least intrusive means of doing so"). Of course, there must be a "close fit" between ends and means, *McCullen*, 134 S. Ct. at 2534, and that is satisfied here.[14] As Judge Mason explained, the Ordinance's no-peddling zone is quite limited in geographic scope. It applies only to the public sidewalks immediately adjacent to the stadium, and, since the City has recently permanently vacated those sidewalks on Waveland and Sheffield Avenues, (7/10/15 Hr'g Tr. 122),[15] applies only to the sidewalks next to the stadium on Clark and Addison Streets (the west and south sides of Wrigley Field).[16] This is the kind of "middle ground" that *Weinberg* suggested in dicta would be a "narrowly tailored" regulation of peddling outside a stadium. 310 F.3d at 1040 ("[T]he City takes what amounts to be an all-or-nothing approach with peddlers [with a ban on peddling

---

[14]Plaintiff contends that Judge Mason disregarded evidence of the Ordinance's "underinclusiveness" in that the City permits other activities that cause sidewalk congestion. (R. 70, Pl.'s Objections at 15-16.) As Judge Mason found, the evidence does not indicate that all of the activities cited by plaintiff in its memorandum are permitted to take place on sidewalks, and the fact that the Ordinance does not address every possible cause for congestion does not undermine the City's interest. (R. 78, Am. R & R at 18.) This is not a case where the underinclusiveness of the Ordinance raises doubts about whether it serves the City's asserted interests.

[15]Those sidewalks are now the Cubs' property.

[16]Plaintiff's argument that the peddling ban amounts to "four City blocks" is inaccurate. (*See* R. 70, Pl.'s Objections at 16.)

within 1000 feet of the United Center]. It avoids finding any kind of middle ground, such as a ban of less distance; a ban on peddling on certain narrow walkways, or a ban on peddling on the sidewalks immediately surrounding the United Center. Restrictions such as these would be less encompassing and less intrusive on First Amendment rights."). The ban on peddling on the sidewalks immediately adjacent to Wrigley Field is narrowly tailored to address the congestion and safety problems that occur when tens of thousands of people are funneled along a crowded streetscape to a stadium occupying a single block. Judge Mason engaged in a thorough and reasoned analysis of narrow tailoring with which this Court agrees.

This Court also agrees with Judge Mason's determination that the Adjacent-Sidewalks Ordinance leaves open ample alternative communication channels. Peddling is permitted on the sidewalks and corners immediately across from the ballpark. The evidence shows that pedestrians visiting the area come from all directions, so plaintiff's vendors and other vendors can station themselves across the street and still have immediate access to communicate with those people. The only pedestrians that may not have to cross Clark, Addison, Sheffield, or Waveland to arrive at the park are those exiting buses or taxis. (R. 78, Am. R & R at 21.) Peddlers can still be visible to and within earshot of this audience. Plaintiff's vendors wear yellow jerseys, and Smerge testified that he repeats the price of *Chicago Baseball* "in a loud tone of voice" and projects his voice so as to be heard by people crossing the street approaching the stadium. (6/16/15 Hr'g Tr. 30, 32-33.)

On this issue, plaintiff "stands by its prior briefing," in which it argued that it is "best able to each its audience by having its vendors stand on the sidewalks adjacent to the stadium."

18

(R. 70, Pl.'s Objections at 16; R. 33, Pl.'s Mem. Supp. Mot. at 19.)[17]  "An adequate alternative,"
however, "does not have to be the speaker's first or best choice, or one that provides the same
audience or impact for the speech."  *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000)
(citing *Heffron*, 452 U.S. at 647).  Here, plaintiff has the same audience, and it does not have to
change its sales tactics to communicate with that audience.  The Adjacent-Sidewalks Ordinance
leaves open ample, realistic alternative channels for both plaintiff's vendors and other peddlers.

Plaintiff has failed to show a likelihood of success on the merits on its claim that the
Adjacent-Sidewalks Ordinance violates the First Amendment.  Accordingly, the Court need not
discuss the other elements of the preliminary-injunction analysis.

## C.     The Peddler's License Ordinance (§ 4-244-030)

Section 4-244-030, the Peddler's License Ordinance (hereinafter, the "Ordinance"),
states: "It shall be unlawful for any person to engage in the business of a peddler without first
having obtained a street peddler [] license under this chapter."  Chi., Ill., Mun. Code § 4-244-
030(a).  Judge Mason concluded that plaintiff failed to show a likelihood of success on the
merits on its claim that this Ordinance violates the First Amendment.

---

[17]Plaintiff's citation to *McCullen* in support of this argument is misplaced.  In *McCullen*, the
Supreme Court held that a statute creating a 35-foot "buffer zone" around abortion clinics was not
narrowly tailored.  134 S. Ct. at 2540-41.  The plaintiffs in *McCullen* were individuals who
attempted to dissuade women from having abortions by engaging in personal conversations and
relying on "a caring demeanor, a calm tone of voice, and direct eye contact during these exchanges."
*Id.* at 2527.  The Court's holding was based in part on the fact that the buffer zones compromised
the plaintiffs' "ability to initiate the close, personal conversations that they view as essential to
'sidewalk counseling.'"  *Id.* at 2535.  This kind of consideration is not present here.  Plaintiff's
vendors try to attract attention by being loud.

Plaintiff argues that Judge Mason's reasoning is flawed for several reasons. (R. 70, Pl.'s Objections at 17.) The first is that the Ordinance is content-based and thus a prior restraint.[18] Here, plaintiff hangs its hat again solely on the newspaper exemption. Even if the Peddler's License Ordinance incorporates the newspaper exemption in § 10-8-520, the exemption would be severable from the license requirement, as discussed above, were the exemption constitutionally invalid under *Reed*. In any event, for the reasons the Court has discussed, the exemption does not render the Peddler's License Ordinance content-based. The exemption is not directed at a topic, idea, or message.

The Ordinance is not an invalid prior restraint. A prior restraint is "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority." *Weinberg*, 310 F.3d at 1044 (citing *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-51 (1969)). Judge Mason correctly found that the Ordinance affords the City "minimal, if any, discretion in choosing to grant or deny an application for a peddler's license." (R. 78, Am. R & R at 24.) Plaintiff contends that the Ordinance gives the City "unfettered discretion" because it does not define the term "newspaper." (R. 70, Pl.'s Objections at 18.) Whether someone sells a newspaper, however, has nothing to do with whether they are issued a peddler's license when they apply for one. Chi., Ill. Mun. Code § 4-244-041; 7/10/15 Hr'g Tr. 23, 32-33, 40, 45-46. As for enforcement of the Ordinance, plaintiff fails to cite to any evidence in the record that supports its

---

[18]Judge Mason specifically noted that plaintiff did not present a "prior restraint" argument to him. (R. 78, Am. R & R at 23 n.17.) Because defendants do not argue that it has been waived, this Court will consider the argument.

argument that the City has an "arbitrary and shifting" definition of "newspaper." (R. 70, Pl.'s Objections at 18-19.)

Plaintiff also maintains that the Ordinance is a "single-speaker licensing scheme" and thus an unreasonable time, place, or manner restriction. (*Id.* at 20.) Defendants correctly point out that although plaintiff complains that Judge Mason's Report and Recommendation "does not address this issue at all," plaintiff never raised the argument prior to filing its Objections. (R. 76, Defs.' Resp. at 18.) It is therefore waived. *See Melgar*, 227 F.3d at 1040; *United States v. City of Rock Island, Ill.*, 182 F. Supp. 2d 690, 694 (C.D. Ill. 2001) ("The review procedure [of magistrate judges' rulings] is not an opportunity for counsel to present new arguments when the ones first tried fail."). Moreover, plaintiff fails to explain how this case is governed by the body of law that addresses single-speaker permitting requirements.

Next, plaintiff contends that Judge Mason "improperly distinguished" *Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002), from the present case. Plaintiff relies on *Watchtower* in arguing that the Ordinance prevents plaintiff from engaging in "anonymous speech" and "spontaneous speech." (R. 70, Pl.'s Objections at 21-23.) The *Watchtower* plaintiffs challenged the Village of Stratton, Ohio's ordinance that made it a misdemeanor to engage in door-to-door advocacy without first registering with the mayor and obtaining a permit. 536 U.S. at 153. The Supreme Court held that the ordinance was invalid because it was unprecedented in covering so much speech, including religious and political speech; burdened anonymous speech; "effectively banned" a significant amount of spontaneous speech; and was not tailored to the Village's stated interests in preventing fraud and crime and protecting residents' privacy. *Id.* at 164-69.

This Court agrees with Judge Mason that *Watchtower* does not guide our analysis of the Peddler's License Ordinance. *Watchtower* is highly fact-specific, and the ordinance at issue there targeted different activity. Furthermore, the Supreme Court made the following statement in *Watchtower:* "Had this provision been construed to apply only to commercial activities and the solicitation of funds, arguably the ordinance would have been tailored to the Village's interest in protecting the privacy of its residents and preventing fraud." 536 U.S. at 165. The Peddler's License Ordinance serves to advance the City's asserted interests in ensuring public safety and the payment of taxes and the prevention of fraud. There is greater potential for fraud in the act of peddling than in the act of speech alone. And the *Watchtower* Court recognized that the preclusion of complete anonymity "may well be justified in some situations—for example, . . . by the interest in preventing fraudulent commercial transactions." 536 U.S. at 167. The Ordinance's burden on anonymity is justified in light of the interests served. Its minimal burden on spontaneous speech is similarly justified.

Plaintiff's final argument is that the Ordinance unconstitutionally imposes a $100 fee for a two-year peddling license, thereby promoting "economic favoritism."[19] (R. 70, Pl.'s Objections at 23-25.) The Court agrees with Judge Mason that plaintiff's argument is without merit and warrants no further discussion.

Plaintiff has failed to show a likelihood of success on the merits on its claim that the Peddler's License Ordinance violates the First Amendment. Accordingly, the Court need not discuss the remaining elements of the preliminary-injunction analysis.

---

[19]A discounted $50 fee is available to veterans, those with physical disabilities, and those 65 years of age or older. (7/10/15 Hr'g Tr. 24-25.)

**CONCLUSION**

For the reasons explained above, the Court adopts Magistrate Judge Mason's Report and Recommendation of July 29, 2015 [63] (as amended on August 28, 2015 solely to add citations to hearing transcripts [78]) in its entirety and denies plaintiff's motion for a preliminary injunction [33]. A status hearing is set for October 8, 2015 at 9:30 a.m.

**SO ORDERED.**                         **ENTERED:    October 5, 2015**

_____
**JORGE L. ALONSO**
**United States District Judge**